UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL NO. |
| v. ) | 3:12 CR 00104 (EBB) |
| ) | |
| JEFFREY BENTON ) | MARCH 18, 2014 |
| ) | |

### DEFENDANT JEFFREY BENTON'S SENTENCING MEMORANDUM

The Defendant, Jeffrey Benton, respectfully submits this memorandum to assist the court in his sentencing, currently scheduled for Tuesday April 1, 2014 at 9:00 a.m. On August 30, 2013, Mr. Benton pleaded guilty to Count One of the Indictment, charging him with Conspiracy to Possess with Intent to Distribute and to Distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§841(a)(1), 841(b)(1)(B), and 846. For this offense, the statute carries a mandatory minimum penalty of five years in prison. Mr. Benton has pleaded guilty with an expected guideline range of 100-125 months, and the government has agreed not to seek a sentence above 108 months. Since the time of his arrest on May 17, 2012, Mr. Benton has been detained. For the reasons set forth below, Mr. Benton should receive the bottom of his guideline range, or below, receiving credit for the time he has spent in detention since his arrest on May 17, 2012.

### I. BACKGROUND

Mr. Benton had a rough childhood. His parents were never married, and he really had no relationship with his father. Mr. Benton's father overdosed on heroin when Mr. Benton was just seven years old. Therefore, drugs and the negative effects of those drugs

1

were an everlasting presence in Mr. Benton's life from the beginning. See **Exhibit A**, letter from Mr. Benton addressed to this Court.

Mr. Benton has five siblings from his mother, but only one of those siblings share the same father as Mr. Benton. All of Mr. Benton's siblings suffered from the same rough childhood lived by Mr. Benton, and it has shown in how they lead their lives today. Mr. Benton's oldest brother, Clarence, is incarcerated on a federal drug charge. He is currently housed at Fort Dix, New Jersey and is set to be released in 2018. Two of his other siblings, Latasha (who has one daughter) and Terrance both still reside with Mr. Benton's mother. Another sibling, Leandrey (Mr. Benton's only full sibling) does not have much contact with Mr. Benton, although Mr. Benton reported that Leandrey has eight children at the age of 29. The only sibling to have apparently done something with her life is Mr. Benton's youngest sister, Crystal. Crystal moved to North Carolina to live with her paternal grandmother and is employed as a Certified Nursing Assistant.

Mr. Benton's mother dated a man named Lloyd Tucker from 1994 to 2006. Although they never married, Mr. Benton always considered Mr. Tucker to be his stepfather, and he was really the only father figure Mr. Benton had. Mr. Tucker worked construction, and taught Mr. Benton how to perform that work as well. Mr. Benton's mother eventually ended her relationship with Mr. Tucker due to his infidelity, but Mr. Benton remains on good terms with Mr. Tucker.

Growing up, Mr. Benton was surrounded by drugs and violence as a way of life. At the age of 11, Mr. Benton even witnessed his best friend, Jose, gunned down and killed by a stray bullet. Although he was close with his mother and his siblings, Mr. Benton's mother was routinely unemployed and money was always an issue. In addition,

2

Mr. Benton grew up feeling angry that he did not have a father and was unable to have all of the other things that children his age were able to have. Knowing this background, it is no wonder that Mr. Benton, and all but one of his siblings, turned out as they did. Unfortunately, they succumbed to their environment and continued the cycle of living a life surrounded by the violence, drugs, unemployment, and indiscriminate procreation.

Mr. Benton began following this life at a very young age, when he would get into trouble at school and was suspended as early as 10 years old. Mr. Benton admitted getting into trouble and being friends with others who also caused a lot of trouble. At the age of 13 years old, this behavior meant Mr. Benton was forced into a youth detention center, which eventually led him to attend Long Lane Connecticut Juvenile Training School. Therefore, Mr. Benton spent much of his teen years in a detention center rather than in the care of his mother. Mr. Benton had no positive influences in his life, and this negativity was reinforced by his own criminal behavior and his subsequent incarcerations, for all intents and purposes, at such a young age.

Mr. Benton has had drugs involved with his life since he was child, and turned to that as a way to earn a living when he became old enough, as that is what he knew. He used many drugs in his life, including alcohol, marijuana, cocaine, and ecstasy. He began smoking marijuana when he was just 10 years old and began social drinking at just 12 years old. Mr. Benton would definitely benefit from the 500 hour drug program once incarcerated at a permanent federal facility.

When Mr. Benton became an adult, he continued this criminal behavior and was arrested on many occasions. When Mr. Benton was arrested on this case, his girlfriend was pregnant with his daughter, who was born just three months after his arrest. His

3

daughter, Raven, is Mr. Benton's first child and he would like, more than anything, to be a part of her life. He knows what it is like to grow up without a father, and he does not want to do that to his own daughter. Mr. Benton and his girlfriend plan on continuing their relationship throughout Mr. Benton's incarceration in this case and subsequent.

Although Mr. Benton's life has been a struggle, he is still young enough to turn his life around, especially now that he has a daughter to raise. Although Mr. Benton has been arrested and incarcerated prior to this case, this is his first federal conviction. This will be, by far, the longest incarceration he has ever faced. By receiving this conviction after his daughter was born, he received the "wake up call" that he needed to change. He realizes now that he will be well into his 30's by the time he is released and he will be too old, at that time, to resort back to the street life, especially knowing he has a girlfriend, a daughter, and a stepdaughter all relying on him to remain with them rather than in jail. Although Mr. Benton's IQ and mental assessment were not very high, he can definitely change his behavior and function without the help of drugs and illegal activity[1], especially if given the proper training while incarcerated. Mr. Benton also wishes to obtain his GED while incarcerated[2]. Thus, Mr. Benton would benefit from substance abuse counseling and would also benefit from any vocational training that might be offered at his permanent facility.

## II. CRIMINAL HISTORY

Mr. Benton's criminal history consists of various prior state convictions before the instant offense. He agrees that he has enough criminal history points to place him

---

[1] Mr. Benton's step father taught him various aspects of the construction business, in which he worked in the past. Therefore, he has skills that could take him further in life.
[2] Mr. Benton attempted to obtain information regarding his GED while he has been incarcerated at Wyatt, but that facility does not offer GED testing. See **Exhibit D**. Thus, as soon as Mr. Benton is sent to his permanent facility, this is something he will pursue.

4

into Category V of the sentencing guidelines. Mr. Benton is not currently on probation or parole.

The PSR details information about Mr. Benton's juvenile convictions, and Mr. Benton objects to this information being included as prejudicial to his case. The PSR details cases as far back as when Mr. Benton was 11 years old, approximately 18 years ago. It also details information from a case where Mr. Benton was adjudged a Youthful Offender. Mr. Benton understands the probation officer's reasoning for including such information, which is outlined to the Addendum to the PSR. Nonetheless, Mr. Benton objects to the use of such information. Crimes that Mr. Benton may or may not have committed when he was a child should not now be held against him in fashioning a correct sentence in this case. Therefore, Mr. Benton objects to any reference to any crime committed prior to his 18th birthday or any crime for which he was not _tried as an adult_.

Pursuant to §4A1.2(d) of the Federal Sentencing Guidelines, a prior sentence given to the defendant before the age of 18 should only be counted towards the calculation of criminal history points <u>if the defendant was tried as adult</u>[3]. It should also be noted that §4A1.2(d)(2)(B) states that one point could be added for <u>any sentence</u> of less than 13 months, even if the defendant was not tried as adult, as long as the sentence was <u>imposed within five years</u> of the defendant's commencement of the instant offense.

---

[3] See United States v. Conca, 635 F.3d 55, 65 (2d Cir. 2011) ("To resolve the issue of 'convict[ion] as an adult,' U.S.S.G. § 4A1.2(d), the *Driskell* Court 'believ[ed] the better course is for a district court to examine the substance of the prior conviction at issue; to 'focus on the nature of the proceedings, the sentence received, and the actual time served.' *U.S. v. Driskell*, 277 F.3d 150,157 (2d Cir. 2002) (quoting *United States v. Pinion*, 4 F.3d 941, 944 (11th Cir.1993)). It therefore can be said that the determination of whether a youthful offender adjudication can be classified as an adult conviction 'is a function of many variables, no single one of which is dispositive.' *United States v. Jackson*, 504 F.3d 250, 253 (2d Cir.2007).")

5

In this case, there is no indication that Mr. Benton was tried as adult for any case before his 18th birthday. In any event, the adjudication of one prior offense, for which he received one criminal history point, occurred in 2003, with a violation of probation occurring in February 2006. Thus, this is more than five years prior to the instant offense. Because this prior offense, where Mr. Benton was originally adjudicated a Youthful Offender, does not fall into any category as set forth in §4A1.2, this prior conviction should not be counted towards Mr. Benton's criminal history points. Thus, Mr. Benton argues that this prior offense was committed while Mr. Benton was still a child and should not enter into the court's consideration when determining an appropriate sentence in this case.

### III. FACTS SURROUNDING THE INSTANT OFFENSE

Several years ago, the DEA, ATF, the New Haven Police Department, and the Hamden Police Department began investigating two local street gangs in the New Haven area. It was determined that co-defendant, Kevin Wilson, was a principal source of supply of narcotics for the area and his telephone was eventually targeted for a wiretap. The government listened to Mr. Wilson's phone for approximately five months, from July 29, 2011 until January 3, 2012. Mr. Benton was heard for just over one month on phone calls and text messages with Mr. Wilson, as well as a few with co-defendant Britt Martin. Calls and texts messages involving Mr. Benton began on November 23, 2011 and ended December 27, 2011. Mr. Benton was only on a handful of phone calls, even though thousands or calls and text messages were intercepted by the authorities. Mr. Benton's calls number far less than many of his co-defendants. Indeed, the authorities

did not even know Mr. Benton's name when this investigation began, but only learned his name through these calls and text messages that lasted approximately 35 days.

During the time of the investigation, Mr. Benton concedes that he was speaking to Mr. Wilson about drug transactions. In addition, however, he was also speaking to his friend (not just a drug dealer) on the telephone and through text messages, and discussing other information, besides the purchase of narcotics from Mr. Benton through Mr. Wilson. In any event, however, Mr. Benton agreed that, based upon these calls and messages, he could be found liable for more than 100 but less than 400 grams of heroin. Mr. Benton does not believe the telephone calls intercepted during this month involved the actual eventual purchase of more than 100 grams of heroin. That being said, Mr. Benton acknowledges that he did purchase heroin from Mr. Wilson and understands that he would have, in all likelihood, been found guilty at trial. Mr. Benton, therefore, decided to admit his responsibility in this case and admit what he did, even if he continues to disagree with the quantity. Mr. Benton wishes to try to move on with his life and not put his family through this any longer.

On the day of Mr. Benton's arrest, he was taken into custody at his girlfriend's apartment, where he occasionally spent the night. Because there was problems with the subsequent search of that apartment, Mr. Benton originally filed a motion to suppress any tangible evidence found in the apartment, including several firearms. Following a hearing on the matter, however, Mr. Benton realized that there was a high likelihood that his motion would be denied and he would be found guilty after trial. Thus, after much contemplation, Mr. Benton decided to plead guilty and accept his responsibility in this case. Although he understands that, in his plea agreement, there is an enhancement for

the firearms found in his girlfriend's apartment, Mr. Benton still stands by his arguments made at the suppression hearing and argues that the enhancement should not be used to increase his sentence. The firearms were found in an apartment in which he did not live and no possessory control. In addition, the firearms were found after a search that was questionable, at best. The government never tested the firearms to ensure they belonged to Mr. Benton. Therefore, Mr. Benton continues to argue that these were not his firearms, they were not used in connection with a drug trafficking offense, and he should not be given an enhancement to his sentence.

## IV. STATUTE AND GUIDELINE RANGE

Mr. Benton pleaded guilty to Count One of the Indictment, charging him with Conspiracy to Possess with Intent to Distribute and to Distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§841(a)(1), 841(b)(1)(B), and 846.

According to the PSR, Mr. Benton's guideline range should be based upon between 100 and 400 grams of heroin, which would give him a Level 26. When Mr. Benton pleaded guilty, he agreed to an additional two levels for possessing a firearm in connection with a drug trafficking offense. Finally, he should be given a reduction of three levels for acceptance of responsibility, resulting in an adjusted level of 25. Mr. Benton falls into a Category V criminal history, which provides a guideline range of 100-125 months. In the plea agreement, the government agreed not to request a sentence greater than 108 months.

Pursuant to the plea agreement, the government agreed that there was insufficient proof to claim that Mr. Benton's prior felony convictions would qualify to characterize

Mr. Benton as a second offender or a career offender. Therefore, the parties agreed that Mr. Benton's prior convictions do not qualify at this time.

Thus, the parties agree that Mr. Benton's applicable range is 100-125 months.

Mr. Benton would like to argue, however, that he should be given a reduction by two levels, pursuant to §3B1.2(b), for being a minor participant in this criminal activity. In this case, Mr. Benton was substantially less culpable than the average participant in this alleged conspiracy. A minor participant is one who "is less culpable than most other participants, but whose role could not be described as minimal." See §3B1.2, comment 5. "A reduction will not be available simply because the defendant played a lesser role than his coconspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' or 'minimal' as compared to the average participant in such a crime." U.S. v. Rahman, 189 F.3d 88, 159 (2d Cir.1999); see also U.S. v. Shonubi, 998 F.2d 84, 90 (2d Cir. 1993) (a district court will look to factors such as "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise."). As compared to the average participant in this alleged conspiracy, there is no doubt that Mr. Benton's conduct should be considered minor. The government intercepted thousands of phone calls in this case, but only a handful belonged to Mr. Benton, for only just over 30 days, and not all of these calls involved the discussion of drugs. Therefore, as compared to the average participant in this criminal activity, Mr. Benton is a minor player. Mr. Benton had contact with Mr. Wilson, as well as Mr. Benton's cousin, Britt Martin, but no one else in the indictment. Thus, Mr. Benton was

not important to the success of this alleged conspiracy. Mr. Benton, therefore, deserves a two-level reduction pursuant to §3B1.2 for being a minor participant.

## V. ARGUMENT

Because Mr. Benton had a very rough childhood, because he was raised to believe that drugs and violence were a way of life, because no one was ever there to teach him a different way of life, because there is no evidence he possessed any weapons in connection with the drug trafficking offense, and because Mr. Benton now wants to be there for his family and new baby, Mr. Benton should be given the bottom of his guideline range or below.

The Court must impose a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. §3553(a). Title 18, United States Code §3553(a) provides a litany of factors for the Court to consider in making its determination of a reasonable sentence, of which the following are the most pertinent here:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    B. to afford adequate deterrence to criminal conduct;

    C. to protect the public from further crimes of the defendant; and

    D. to provide the defendant with needed education or vocation training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentence available;

(4) the kinds of sentence and sentencing range established for –

> A. the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines…
>
> (5) any pertinent policy statement –
>
> A. issued by the Sentencing Commission…
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;…

Id.

In United States v. Crosby, the Second Circuit set out the following analysis for approaching sentencing:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Crosby, 397 F.3d 103, 113 (2d Cir. 2005).

### A. Nature and Circumstances of the Offense and Characteristics of the Offender

One factor is the nature and circumstances of the offense and the characteristics of the defendant. In this case, Mr. Benton had a very rough life, even up until he was arrested in this case. He grew up without a father, because his father was not in his life and then because his father died at an early age due to a heroin overdose. Mr. Benton grew up as one of six children from his mother, but he only shared a father with one of

those siblings. He grew up in poverty and in the ghettos of New Haven, where violence and drugs were a way of life. He saw first-hand what that life could bring, by seeing his father die of a heroin overdose and by seeing his best friend be gunned down by a stray bullet. Yet, when he came of age, he knew of no other way to live and earn a living. His criminal behavior began at a very young age and was never corrected. He now finds himself a 29 year old new father, facing a possible nine year sentence. Mr. Benton had a very rough beginning, but that does not mean all is lost on him for the future. He is now facing a federal sentence, and the longest sentence he will have ever had to endure. Now that he has a daughter, he understands what this period of incarceration will do to his family. He has many people who love him waiting for him on the outside, and he wants to work to be there for them now. With the proper training, he can learn to change his behavior to be there for his family. He just needs to be given the chance.

This court should also keep in mind that Mr. Benton is a brand-new father. Although, pursuant to the Federal Sentencing Guidelines §5H1.6, "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted," it is a factor that this court should examine. Mr. Benton's daughter was born a few months after he was arrested in this case. He grew up without a father, and he realizes how important it is for him to be there for his daughter Raven. In addition, his girlfriend, Kawya, had a daughter when he began dating her, and he treats this girl as his own. Kawya plans on being there for him while he is incarcerated and when he is released. Therefore, Mr. Benton knows his family is waiting and knows how important it is to change his behavior now so that he could be a good father upon his return. Even though Mr. Benton broke the law, and he understands that, he still wants to be there for

his family. He wants to be away from them for the least amount of time so that he can get back to them while his daughter is still young. Mr. Benton and Kawya have plans to move south once he is released and leave behind this life in Connecticut. Mr. Benton has family in North Carolina, and he would like to start fresh in another part of the country, away from the street life that he has known since birth. Mr. Benton would like to pursue his skills in construction, and possibly work in plumbing or heating and air conditioning. Mr. Benton is trying to put together the tools needed to change his life for his family.

### B. The Need for the Sentence to be Imposed

Another factor is the need for a sentence to be imposed. Factors to consider are: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." See 18 U.S.C. §3553(a)(2).

Mr. Benton understands the serious nature of his offense, and he understands he is facing a considerable time in prison. Mr. Benton is adamant that his criminal life is behind him, and he wants nothing more than to be there for his family in the future. Mr. Benton will be well into his 30's upon his release, and he understands that he will then be too old to be living the "street life" anymore. Mr. Benton would benefit from the 500 hour program provided in the federal prison system to treat his substance abuse. He would also benefit from any vocational training the facility might offer. Mr. Benton has been institutionalized for a major part of his life. Unfortunately, he was never properly trained in how to live a life free of crime. His step father, however, did teach him various

aspects of the construction business. Therefore, Mr. Benton could definitely earn a living in this industry in the future, if he is able to take advantage of more training while incarcerated. This will not only help Mr. Benton, but will also be beneficial to society in general if Mr. Benton can avoid future involvement with the criminal justice system.

### C. Kinds of Sentences and Sentencing Range Available

A third factor is the sentencing range for Mr. Benton. Mr. Benton's sentencing guideline range is 100 to 125 months. The government is seeking a sentence of 108 months, or nine years. Mr. Benton, instead, asks for a sentence that is at the bottom of his range, if not lower. Mr. Benton pleaded guilty and acknowledged that the government could ask for a two level enhancement for possessing a firearm in connection with a drug trafficking offense. Mr. Benton would like to argue, however, why the Court should decline to enhance his sentence.

In this case, the firearms that Mr. Benton is charged with possessing were found in the closet of his girlfriend's apartment. The defendant is not aware of any fingerprints or DNA testing done on these weapons to prove that Mr. Benton actually possessed them. Mr. Benton previously filed a motion to suppress these weapons, which he agreed to withdraw as part of his plea agreement. In that motion, however, Mr. Benton argued to the court that he did not reside at his girlfriend's apartment, but merely spent the night there occasionally. He did not possess any items in the apartment and did not keep any of his personal items there. His name was not on the lease and he received no mail there. The government had no evidence to prove that this was a residence, or even a secondary residence, for Mr. Benton. The only thing the authorities found in the apartment that belonged to Mr. Benton was a change of clothes and his car registration. Mr. Benton's

girlfriend, Kawya, had a roommate, who also had a boyfriend who would spend the night. In addition, Kawya and Mr. Benton had just recently made their relationship exclusive. Prior to that, Kawya had other men in her life, who might also have possessed the weapons and hid them in her closet. Because the government failed to show that Mr. Benton actually possessed those weapons, because Mr. Benton had no other personal items stored at the apartment, and because those weapons might have belonged to a host of other people, Mr. Benton would ask this Court to exercise its discretion and deny the two-level enhancement under §2D1.1(b)(1).

Without that enhancement, Mr. Benton would fall under Level 23 with a Category V criminal history, giving him a range of 84-105 months. Mr. Benton would request a sentence within the low end of that range, giving him credit for time spent incarcerated prior to his sentencing.

### D. The Need to Avoid Unwarranted Sentence Disparities

A fourth factor is the need to avoid unwarranted sentence disparities among co-defendants and among all those defendants convicted of this crime.

This Court should keep in mind the Smarter Sentencing Act[4], currently pending in Congress, as well as the remarks by Attorney General Eric Holder from August 2013 to the American Bar Association. The Smarter Sentencing Act is calling for sentencing reform that would cut in half the mandatory minimum sentences for certain nonviolent drug offenses and end mandatory minimum sentences for drug offenders without a criminal history. One of the reasons behind this bill is the fact that federal prison costs are on the rise and the federal prison population exceeds its capacity. See http://www.nationallawjournal.com/id=1202640948821/Sentencing-Bill-Passes-Key-

---
[4] Senate Bill 1410

Test?slreturn=20140203141927. There is a thought that punitive drug policies destroy lives and tear families apart and that this country incarcerates too many people for too much time at too great a cost to taxpayers. See http://www.thedailychronic.net/2014/27445/smarter-sentencing-act-passes-senate-judiciary-committee/.

When Attorney General Holder addressed the American Bar Association in August 2013, he remarked that of the more 216,000 federal prison inmates at that time, almost half of them were serving time for drug-related crimes. Attorney Holder called upon the U.S. Attorneys and the federal prosecutors to better allocate resources. He also asked the U.S. Attorneys to examine sentencing disparities among various ethnic minorities and develop recommendations on how to address those disparities. Attorney Holder stated that the first way to do that is to rethink the notion of mandatory minimum sentences for drug-related crimes. He stated eliminating mandatory minimum sentences for low-level offenders will give judges more discretion in sentencing and hopefully have an impact on the reduction in recidivism rates.

On January 9, 2014, the U.S. Sentencing Commission, presumably in response to Congress and Attorney Holder, released a proposal to reduce by two levels the base offense levels for all drug trafficking cases. See **Exhibit B**. Although this law has not yet been enacted and these proposed changes to the sentencing guidelines have not yet been implemented, this Court should keep them in mind when fashioning an appropriate sentence. On Thursday, March 13, 2014, Attorney General Holder and the Justice Department directed prosecutors nationwide not to object if defendants sought to have the newly proposed guidelines applied to them during sentencing. See **Exhibit C**. If this law and these changes are enacted, Mr. Benton's level could be reduced by two, providing

him with a range of 84-105 months (even without a reduction for a minor role and even with leaving the enhancement for the firearms). Thus, the Defendant asks this Court to apply these changes now, rather than waiting for the changes to take effect in November. Applying these changes now will fall in line with the wishes of Attorney General Holder and the Justice Department.

The Smarter Sentencing Act, as well as Attorney Holder's words, shows a change in thinking in our government regarding how the federal courts treat drug offenders. Drug offenders make up a large spectrum of the federal prison population. Mr. Benton understands that what he did was wrong, but he does not wish to be another statistic in the federal system. With the proper help and the proper training, Mr. Benton could leave behind this life and work towards a crime-free life. This will not happen, however, if Mr. Benton is sentenced to an excessively long prison term. Providing Mr. Benton with that kind of sentence will only seek to allow yet another child on the streets of New Haven to grow up without a father. Mr. Benton should be incarcerated for a period of time that is sufficient to punish him, to deter him from future crime, and to rehabilitate him to lead a life away from crime. The sentence should be sufficient to accomplish those goals, while not be greater than necessary to do the same. A sentence within the adjusted range of 84-105 months will be sufficient without being greater than necessary to accomplish the goals of sentencing.

Overall, Mr. Benton has had a very rough upbringing and faced many challenges in life. He faced challenges at such a young age that no one of that age should have to conquer. If provided with the appropriate tools, he can change his life around and leave any criminal behavior in his past. Considering all of the factors discussed herein and

considering this court should be concerned with providing a sentence that is sufficient but not greater than necessary, Mr. Benton asks for a sentence at the bottom of his adjusted guideline range, but beneath the sentence of 108 months, which is requested by the government.

## VI. CONCLUSION

For the foregoing considerations, the Defendant, Jeffrey Benton, submits that he should be given a sentence within the adjusted range of 84-105 months or below, by taking into account the lack of a gun enhancement or a reduction for minor role. He should also be given credit for his time incarcerated since May 17, 2012. For whatever sentence of incarceration Mr. Benton serves, he would like to request that he be given the opportunity to participate in a 500-hour drug program in prison as well as any vocational training the facility has to offer. He would also request that he be sent to Fort Dix, New Jersey so that he could be close enough for his family to visit with him and because he would like to be housed in the same facility as his brother, Clarence Austin. If Fort Dix is not possible, Mr. Benton asks to remain in the northeast section of the country to be close to his family.

Respectfully submitted,
JEFFREY BENTON

By Jodi Zils Gagné (# Ct24376)
LAW OFFICES OF JODI ZILS GAGNE, LLC
P.O. Box 4023
Bristol, CT 06010
Tel: (860) 582-4495
fax: (860) 582-8397
email: jgagne@zilsgagnelaw.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on this date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                                        Jodi Zils Gagne